ANDERSON NEWS, L.L.C.
and Anderson Services,
L.L.C., Plaintiffs,

v.

AMERICAN MEDIA, INC., Bauer Publishing Co., LP, Curtis Circulation Company, Distribution Services, Inc., Hachette Filipacchi Media, U.S., Hudson News Distributors LLC, Kable Distribution Services, Inc., the News Group, LP, Rodale, Inc., Time Inc. and Time/Warner Retail Sales & Marketing, Inc., Defendants.

No. 09 Civ. 2227 (PAC).

United States District Court,
S.D. New York.

Aug. 2, 2010.

Order Denying Reconsideration
Oct. 25, 2010.

Maria Gorecki, Daniel R. Benson, Hector Torres, Marc E. Kasowitz, Kasowitz, Benson, Torres & Friedman, LLP, Thomas Patrick Lynch, Lynch Rowin, L.L.P. New York, NY, for Plaintiffs.

David George Keyko, Pillsbury Winthrop Shaw Pittman, LLP, Barry J. Brett, Daniel Nathan Anziska, Troutman Sanders LLP, Joseph Francis Donley, Dechert, LLP, Meir Feder, Jones Day, New York, NY, George G. Gordon, Dechert LLP, Philadelphia, PA, Paul H. Friedman, Dechert, LLP, Washington, DC, Pro Hac, Vice, Cynthia E. Richman, Daniel W. Nelson, David Jarrett Arp, Gibson, Dunn & Crutcher, LLP, Washington, DC, Isaac M. Bayda, Jay A. Katz, McElroy, Deutsch, Mulvaney & Carpenter, LLP, Rowan Dud-

ley Wilson, Margaret Emma Lynaugh, Cravath, Swaine & Moore LLP, New York, NY, for Defendants.

## OPINION & ORDER

PAUL A. CROTTY, District Judge:

Defendants move to dismiss plaintiffs' Complaint that defendants, titans of the United States single-copy magazine industry,[1] engaged in an antitrust conspiracy to drive plaintiffs out of business. Prior to February 2009, four wholesalers dominated the single-copy national magazine industry, including Plaintiffs Anderson News, L.L.C. and Anderson Services, L.L.C. (together, "Anderson"). Anderson had been in the magazine wholesale business since 1917 and represented the second largest magazine wholesaler in the United States, servicing 30,000 retail customers in 37 states and operating 47 distribution centers throughout the country. Anderson supplied magazines to bookstore chains, grocery stores, retail outlets, and leading mass-merchandise retailers like Wal–Mart. Anderson ceased normal business activities on February 7, 2009; and its creditors forced it into involuntary liquidation bankruptcy proceedings on March 2, 2009.

The Defendants in this action are national magazine publishers, distributors, and wholesalers.[2] Collectively, they wield substantial power in the single-copy maga-zine sector. Anderson's central allegation is that the Defendants engaged in a collusive anticompetitive scheme to monopolize the United States wholesale single-copy magazine distribution market by boycotting two of the four major U.S. magazine wholesalers: plaintiff Anderson and non-parties Source Interlink Distribution L.L.C. and Source Interlink Companies, Inc. (together, "Source").[3]

Specifically, Anderson alleges that the Defendants colluded to drive it out of business by cutting off 80% of its magazine supply, including such popular titles as *People, Sports Illustrated, Entertainment Weekly,* and *Time.* Anderson also alleges that, concomitant with the magazine boycott, the Defendants spread false rumors that Anderson was in critical financial trouble, raided Anderson's employees along with Anderson's proprietary intellectual property, and coerced Anderson into selling its valuable distribution facilities at fire-sale prices. Cut off from its supply of magazines, Anderson lost millions of dollars and was forced to shut down its national distribution system, as well as its entire business, including its good will, reputation, employee work force, and customer base.

Anderson brought this action on March 10, 2009, alleging a violation of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1); common law claims for tortious interfer-

1. The single-copy magazine industry refers to non-subscription magazine sales in which consumers purchase magazines at retailers, such as newsstands, bookstores, and mass merchandise retailers, as opposed to the subscription sale magazine industry in which magazines are shipped directly to consumers.

2. Defendants include: American Media, Inc. ("AMI"); Distribution Services, Inc. ("DSI"); Curtis Circulation Co. ("Curtis"); Kable Distribution Services, Inc. ("Kable"); Rodale, Inc. ("Rodale"); Hudson News Distributors LLC ("Hudson"); Bauer Publishing Co., L.

("Bauer"); Hachette Filipacchi Media U.S., Inc. ("Hachette"); Time, Inc. ("Time, Inc."); Time/Warner Retail Sales & Marketing, Inc. ("TWR"). Anderson had originally named The News Group, LP ("News Group") as a defendant. On March 12, 2009, however, Anderson dismissed the action against News Group (Dkt. # 3.)

3. Source was the plaintiff in a related antitrust conspiracy action (the "Source Action") (1:09–cv–02227.) The Source Action has since settled.

ence with business relationships; and civil conspiracy.[4] For the reasons stated below, the Court finds that Anderson's Complaint fails to meet the plausibility standard of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) and its progeny. Accordingly, the Court grants Defendants' Rule 12(b)(6) motion to dismiss.

## I. BACKGROUND

In the United States single-copy (i.e., non-subscription sales) magazine industry, magazine publishers, including Defendants AMI, Bauer, Hachette, Rodale, and Time, publish magazines and set their cover prices (Comp. ¶ 27.) The publishers' magazines are shipped to wholesalers, which buy the magazines at 50 to 60 percent of their cover price and sell the magazines to retailers at 70 to 80 percent of the cover price (Comp. ¶¶ 29–30.) Magazine retailers include newsstands, convenience stores, airport terminals, grocery store chains, and mass merchandisers, such as Wal–Mart and Kroger, and specialty retailers like Barnes & Noble and Borders (Comp. ¶ 29.)

After delivery, wholesalers are also responsible for picking up, tabulating, and destroying copies of unsold magazines (Comp. ¶ 30.) Prior to the alleged conspiracy, four magazine wholesalers had 90% of the U.S. market: Anderson (27% market share); Source (31% market share); Defendant Hudson (11% market share); and News Group (21% market share) (Comp. ¶ 30.)

Each publisher retains a national distributor to broker its relationship with wholesalers (Comp. ¶ 27.) National distributors provide marketing and accounting services to wholesalers and guarantee the wholesaler's payment obligations to the publisher (Comp. ¶ 27.) National distributors typically receive two to five percent of the retail sales value of the magazines they handle (Comp. ¶ 28.) The four U.S. national distributors are Defendants TWR, Kable, and Curtis, as well as non-party Comag Marketing Group LLC ("CMG") (Comp. ¶ 28.) Defendant DSI, a subsidiary of AMI, is not a national distributor but provides sales and marketing services to publishers (Comp. ¶ 28.)

According to the Complaint, publishers and national distributors have introduced inefficiencies in the U.S. single-copy magazine distribution system (Comp. ¶ 31.) These inefficiencies include the shipping of excess numbers of magazines, as well as unprofitable titles (Comp. ¶¶ 31–32.)

Magazine wholesalers bear the brunt of these publisher-induced inefficiencies. (Comp. ¶¶ 31–32.) Excess magazine shipping, for example, forces wholesalers to tabulate unsold copies and transport them back to their own facilities for disposal or destruction (Comp. ¶ 31.) Similarly, when publishers ship unprofitable titles, they force wholesalers to bear the extraneous costs of handling and returning unsold magazines (Comp. ¶ 32.) These distribution inefficiencies have squeezed magazine wholesalers. In fact, Mr. Anderson has publicly stated that no one from the Anderson family has taken a profit from Anderson in over a decade (Dec. of Daniel N. Anziska ("Anziska Dec."), Ex. B, at 2.)

Wholesalers have responded to these adverse market dynamics by proposing new magazine distribution ideas (Comp. ¶¶ 32–35.) Wholesalers have, for example, proposed electronic checkout scanning as a cost-effective way of reporting magazine sales and then disposing unsold magazine copies (Comp. ¶ 33.) Publishers and na-

---

**4.** Anderson originally brought a claim for defamation but has since withdrawn this claim (Pf. Mem. at 30, n. 21.)

tional distributors have resisted these efforts to introduce greater efficiency in the single-copy magazine market (Comp. ¶¶ 32–35.) For example, the Complaint alleges that the publishers have adamantly opposed introducing electronic checkout scanning (Comp. ¶ 34.)

Frustrated in its efforts to change these distribution practices, Anderson decided that it would impose a $.07 surcharge (the "Surcharge") on all single-copy magazines (Comp. ¶ 41.) To that end, on January 14, 2009, Mr. Anderson gave a public interview with a representative of the industry publication, *The New Single Copy* ("*The New Single Copy* Interview"). In *The New Single Copy* Interview, Mr. Anderson explained the current industry constraints facing magazine wholesalers and announced that, effective February 1, 2009, Anderson would implement the $.07 Surcharge (Anziska Dec., Ex. B; Comp. ¶ 42.) Since the Surcharge applied to all magazines shipped, Mr. Anderson explained that the Surcharge created an incentive to eliminate the waste and inefficiency caused by the shipping of excessive magazine copies (Anziska Dec., Ex. B, at 2; Comp. ¶¶ 39–40.)

Mr. Anderson presented the Surcharge to magazine publishers as a non-negotiable, take-it-or-leave it demand: either sign an agreement accepting the Surcharge and pay $.07 per magazine, or else face the consequences—no distribution of their magazines (Anziska Dec., Ex. B, at 4, 10.) In addition to the Surcharge, Mr. Anderson announced that Anderson would no longer participate in the investment of electronic checkout scanning, shifting the technology costs to manufacturers or publishers (Anziska Dec., Ex. B, at 2–3.) Mr. Anderson stated that the publishers would "be making decisions as to what they needed to do" (Anziska Dec., Ex. B, at 5.)

The major players of the U.S. magazine industry had a variety of reactions to the $.07 Surcharge. Defendants AMI, Bauer, and Time, for example, held a cordial meeting with Mr. Anderson and responded amicably to the Surcharge (Comp. ¶ 41.) Defendant TWR agreed to a 2% discount off the cover price of all *Time* weeklies or a 2.75% discount off the cover price for all *People* weeklies (Anziska Dec., Ex. B, at 2; Comp. ¶ 53.) TWR also indicated that it would be open to discussing electronic checkout scanning (Comp. ¶ 53.) Defendant AMI continued to ship magazines to Anderson.[5] CMG did not agree to the Surcharge, but proposed a modified arrangement (Anziska Dec., Ex. B, at 2; Comp. ¶¶ 43, 51.) Defendant Kable discussed the idea of offering Anderson exclusivity in certain territories if Anderson dropped the Surcharge (Comp. ¶ 50.) Defendant Curtis informed Mr. Anderson that he "would like to get this worked out," but that he would "have to go with whatever Rich [Jacobsen, CEO of Defendant TWR] does." (Comp. ¶ 49.) Curtis also supported Anderson over Anderson's competitor Source, telling Mr. Anderson, "you need to let Source go out first" (Comp. ¶ 50.)

Notwithstanding the variety of responses to Anderson's Surcharge, the Complaint alleges that Defendants colluded to destroy Anderson (Comp. ¶¶ 45–63.) According to the Complaint, "[D]efendants saw Anderson's proposed fee as nothing short of an opportunity to eliminate Anderson as a wholesaler" (Comp. ¶ 44.) In fact, according to Anderson, the Defendants' receptivity to Anderson and its proposed Surcharge was a masquerade, designed to disguise the Defendants' choreographed antitrust conspiracy (Comp. ¶¶ 41, 53–55.)

The goal of the alleged conspiracy was to monopolize the magazine wholesale

---

5. *See* below, note 6.

market and use that anticompetitive monopoly power to shift to retailers and consumers—and away from publishers—the entire financial burden resulting from worsening market conditions and publisher-induced inefficiencies in the magazine distribution system (Comp. ¶ 4.) According to the Complaint, in 2008, one of the Defendants, Curtis, attempted to injure Anderson by informing Wal–Mart, one of Anderson's primary retail clients, that Curtis would no longer supply magazines to Anderson (Comp. ¶ 45.) Wal–Mart, however, frustrated Curtis's efforts by supporting Anderson and accepting the proposed supply stoppage (Comp. ¶ 45.) As a result, Curtis resumed its magazine supply (Comp. ¶ 45.)

Curtis's 2008 unilateral attempt to harm Anderson stands in contrast to Defendants' 2009 collusive attempt to destroy Anderson. To effect their collusive scheme, in late January 2009, national distributor Defendants Curtis, Kable, and TWR, and publisher Defendants Bauer, Hachette, Rodale, and Time cut off 80% of Anderson's magazine supply, including the most popular titles, like *"People* and *Sports Illustrated"* (Comp. ¶¶ 47, 64.)[6] The Complaint further alleges that "at the same time," Defendants spread false rumors to Anderson's customers that Anderson was in critical financial trouble; "sought to acquire Anderson's distribution facilities; and poached Anderson's employees and their proprietary intellectual property" (Comp. ¶¶ 3, 48, 57, 64.) In furtherance of this alleged conspiracy, the defendants held numerous meetings throughout the latter part of January and the early days of February, including a meeting held at Hudson's offices in January 2009, attended by Curtis, TWR, News Group, and Hudson (Comp. ¶ 55.) During these meetings, Defendants allegedly discussed dividing the U.S. distribution territory into two regions, one controlled by Defendant Hudson and the other by News Group. (Comp. ¶ 55.)

The Complaint alleges that Defendants' conspiracy succeeded in destroying Anderson (Comp. ¶¶ 64–68.) Deprived of 80% of its magazine supply, Anderson was unable to cover its costs; and, on February 7, 2009, suspended its operations (Comp. ¶¶ 65–66.) Anderson was forced to lay off thousands of employees and sell its distribution-related assets to News Group at fire-sale prices (Comp. ¶ 67.) News Group has also succeeded in taking over Anderson's retail distribution business at increased rates, as high as 12% over prior rates (Comp. ¶ 59.)[7] The Complaint also alleges, however, that the elimination of Anderson has substantially reduced the output of magazines as well as the ability of retailers to obtain magazines (Comp. ¶ 72.)

In the weeks following February 7, 2009 Anderson's finances continued to deteriorate (Comp. ¶ 68.) Anderson's creditors filed an involuntary bankruptcy petition on

---

6. The Complaint alleges that Defendant AMI participated in the boycott of Anderson, (Comp. ¶ 47), but judicial proceedings establish the opposite. An Order of the Delaware Chancery Court determined that AMI continued to ship magazines to Anderson in February of 2009. *See American Media, Inc. v. Anderson News, L.L.C.,* Index. No.: 4369–VCL. The doctrine of collateral estoppel allows the Court to take judicial notice of that Order since AMI and Anderson were parties to that dispute. *See Jacobs v. Law Offices of*

*Leonard N. Flamm,* 2005 WL 1844642, at *3 (S.D.N.Y.2005). As discussed below, based on the Order of the Delaware Chancery Court, the Court rejects Anderson's antitrust allegation as to AMI.

7. This allegation names Defendant Hudson along with non-party News Group. In a letter to the Court dated June 9, 2010, however, Anderson withdrew this allegation as to Hudson.

March 2, 2009, seeking to liquidate Anderson (Comp. ¶ 68.) With Anderson's liquidation, the remaining wholesalers, including News Group and Hudson, have taken over more than a quarter of the U.S. market share. (Comp. ¶ 76.) As a result, News Group and Hudson currently control over 50% of the U.S. wholesale magazine distribution market (Comp. ¶ 76.)

## II. PLEADING AN ANTITRUST VIOLATION

### i. Standard of Analysis

Fed. R. Civ. P. 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)(2)*. The pleading must state a claim which is facially plausible, not merely speculative. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

Plaintiffs asserting a claim for violation of the Sherman Antitrust Act must establish a "contract, combination ..., or conspiracy, in restraint of trade or commerce." *Id.* at 548, 127 S.Ct. 1955 (quoting 15 U.S.C. § 1). "The crucial question in a Section 1 case is therefore whether the challenged conduct stems from independent decision or from an agreement." *Starr v. Sony BMG Music Entertainment*, 592 F.3d 314, 321 (2d Cir. 2010). At the pleading stage—as opposed to summary judgment stage—an antitrust complaint does not have to tend to rule out the possibility that the defendants were acting independently. *Id.* Plausibility does not impose a probability requirement at the pleading stage, but demands only that the pleading contains enough facts to justify "a reasonable expectation that discovery will reveal evidence of illegal agreement"; the complaint must contain "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955.

Parallel conduct is admissible circumstantial evidence from which the factfinder may infer agreement. *Id.* Parallel conduct itself, however, does not constitute a violation of the Sherman Antitrust Act, because it is "consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Id.* A complaint alleging an antitrust claim must set forth sufficient facts to raise a plausible suggestion that the purported parallel conduct stemmed from an agreement. *Starr*, 592 F.3d at 323. Thus allegations of parallel conduct coupled with bare assertions of conspiracy are not sufficient to state a claim; rather, parallel conduct allegations must be placed in a context that raises a suggestion of a preceding agreement. *Twombly*, at 556–57, 127 S.Ct. 1955. Examples of parallel conduct allegations that would suffice under this standard include "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." *Id.*, at 556 n. 4, 127 S.Ct. 1955.

Antitrust allegations need not be detailed with overt acts by each defendant, but must plausibly state how each defendant was involved in the alleged conspiracy. *Hinds County v. Wachovia Bank N.A.*, 700 F.Supp.2d 378, 394 (S.D.N.Y. 2010). Allegations connecting defendants to the conspiracy "must be viewed in light of the complaint as a whole." *Id.*, at 397.

### ii. Analysis of the Overall Plausibility of Anderson's Antitrust Allegations

Anderson's antitrust allegations do not meet *Twombly's* plausibility standard. The Complaint alleges that Defendants engaged in a broad industry-wide conspiracy. The ultimate goal of this alleged

conspiracy was to eliminate both Anderson and non-party Source, two of the four largest magazine wholesalers (Comp. ¶¶ 4, 58.) This goal is not plausible. Publishers and national distributors have an economic self-interest in more wholesalers, not fewer; more wholesalers yields greater competition, which is good for suppliers. Destroying Anderson and Source would reduce the publisher's wholesale outlets from four to two and would give Hudson and News Group, the two remaining major wholesalers, 90% of the market share (Comp. ¶ 76.) This is too much market power to yield to wholesalers. Indeed, the Complaint alleges that Anderson's demise has substantially reduced the output of magazines as well as the ability of retailers to obtain magazines (Comp. ¶ 72.) It is implausible that magazine publishers would conspire to deny retailers access to their own products. Collusion to destroy Anderson and non-party Source—the ultimate goal of the alleged conspiracy—is facially implausible.

The Defendants' had different reactions to Anderson's unilateral Surcharge. That diversity compounds the implausibility of Anderson's antitrust claim. Anderson predicates its antitrust claim on a theory of conscious parallel conduct, i.e., a pattern of uniform business conduct. The Complaint's core parallel conduct allegation is that Defendants cut off 80% of Anderson's magazine supply (Comp. ¶¶ 47, 58.) The Defendants, however, reacted differently to Anderson's Surcharge: AMI, like non-party CMG, continued to supply magazines to Anderson and thus could not have participated in the parallel conduct;[8] Bauer and Time held a cordial meeting with Anderson and responded amicably to the Surcharge (Comp. ¶ 41); TWR agreed to a 2% discount off the cover price of all *Time* weeklies or a 2.75% discount off the cover price for all *People* weeklies (Anziska Dec., Ex. B, at 2; Comp. ¶ 53); Kable offered Anderson exclusivity in certain territories if Anderson dropped the Surcharge (Comp. ¶ 50); and Curtis informed Mr. Anderson that he "would like to get this worked out," but that he would "have to go with whatever Rich [Jacobsen, CEO of Defendant TWR] does" (Comp. ¶ 49.) Conspirators hatching a concerted scheme to destroy Anderson would not have reacted so differently to the Surcharge. The dramatic differences among the Defendants' reactions undermine Anderson's theory of conscious parallel conduct.

Even if the Complaint plausibly alleges conscious parallel conduct, however, the Court would still grant Defendants' motion to dismiss because the Complaint fails to place the parallel conduct in a context plausibly suggesting collusion. The Complaint does not contain allegations of direct evidence of a conspiracy; there are, for example, no allegations of statements by an insider informant, nor are there allegations of records disclosed through a government investigation.[9]

---

8. *See* above, note 6.

9. Rather, Anderson relies on several vague statements by executives of some of the Defendants' regarding collusion (Comp. ¶¶ 49, 50, 52, 54, 56.) These statements are insufficient. See below the discussion of the sufficiency of the antitrust allegations as to the Defendants individually. Anderson also relies heavily on paragraph 55 of the Complaint, which alleges that "throughout the latter part of January and the early days of February" (i.e., the entire duration of the alleged con-

spiracy) certain unnamed defendants held "numerous meetings" in unspecified places; that (at some indeterminate date) Curtis, TWR, News Group, and Hudson, met at Hudson's New Jersey offices; and that during these alleged meetings, Defendants discussed dividing the U.S. distribution territory into two regions, one controlled by Defendant Hudson and the other by non-party News Group. Like the vague statements of some of the Defendants' executives, these allegations are also insufficient to plausibly suggest a

■ Since there are no allegations of direct evidence of a conspiracy, the Complaint may state a claim only if (i) the parallel conduct itself creates an inference of collusion, or (ii) the Complaint contains circumstantial evidence plausibly suggesting that the defendants reached an agreement prior to engaging in the parallel conduct. *See Starr,* 592 F.3d at 321–323. These two factors demonstrate why the context in which the Defendants' parallel conduct occurred is crucial to determining the plausibility of claims brought under Section 1 of the Sherman Antitrust Act: "[W]hen allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly,* 550 U.S. at 557, 127 S.Ct. 1955; *see also Starr,* 592 F.3d at 328–29 (J. Newman, concurring).

The context here is that until January 14, 2010 there is no allegation of conspiracy. On that date, Anderson initiated a $.07 Surcharge on a take it or leave it basis. The demand was presented by a widely circulated trade magazine. Anderson's demand required a response. While the responses varied, ultimately the magazine publishers decided not to acquiesce to Anderson's demand. In this context, the Defendants' decision to stop doing business with Anderson—the key parallel conduct allegation—does not create an inference of collusion; rather, it is "in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955.

The context of the alleged parallel conduct is Anderson's unilateral Surcharge. The Surcharge drove Defendants' interactions with Anderson, as Anderson initially desired. Anderson publicly announced the Surcharge on January 14, 2009, and the claimed conspiracy began almost immediately thereafter, unfolding rapidly and driving Anderson out of business within weeks (¶¶ 42, 47, 66.) The Complaint recognizes the centrality of the Surcharge by highlighting it in several paragraphs (¶¶ 39–44) and presenting it as the backdrop to Defendants' alleged conspiracy: "[D]efendants saw Anderson's proposed fee as nothing short of an opportunity to eliminate Anderson as a wholesaler" (Comp. ¶ 44.)

But that characterization does not describe what happened. The Defendants were not acting in a vacuum; they were reacting to Anderson's Surcharge, an added fee on all single-copy magazines. Anderson presented the Surcharge as an ultimatum: the Defendants would either have to accept the Surcharge in writing or lose Anderson's services (Anziska Dec., Ex. B, at 4, 10.) Definitive in his presentation of the Surcharge, Mr. Anderson recognized that the publishers would "be making decisions as to what they needed to do" (Anziska Dec., Ex. B, at 5.) The magazine publishers did not acquiesce to Anderson's demands and accordingly Anderson's services were no longer available. Clearly the Defendants made a business decision—and one that each of the Defendants had to, and did, make quickly because of Anderson's demand. While the decision resulted in Anderson losing 80% of its supply of magazines, this was uncho-

---

prior agreement among Defendants. *All Star Carts v. BFI Canada Income Fund et al.,* 596 F.Supp.2d 630, 641 (E.D.N.Y.2009) (holding allegations of conspiracy that are general in nature and allude to nothing more than participation by "defendants" in "meetings" are

subject to dismissal); *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50–51 (2d Cir.2007) (affirming district court dismissal of conspiracy claim where plaintiffs set forth nothing more than general assertions of meetings to agree on anti-competitive conduct).

reographed behavior, a common response to a common stimulus. *See Twombly*, at 556 n. 4, 127 S.Ct. 1955. The Defendants responded to Anderson's unilateral demand, a negative stimulus, by pursuing similar but predictable policies to protect their business interests. Unilateral parallel conduct is completely plausible in this context. The parallel conduct itself does not create an inference of collusion to destroy Anderson; and the Complaint's allegations are insufficient to show that the parallel conduct was collusive.[10]

Anderson argues that Defendants' parallel conduct creates an inference of collusion because unilateral action against Anderson would be contrary to any publisher's individual economic self-interest. Anderson's argument is really that the Defendants had to agree to its demands; otherwise the Defendants would be in violation of the antitrust law. Anderson maintains that no Defendant would have cut off Anderson's magazine supply without knowing beforehand that another wholesaler would take Anderson's place and develop the necessary distribution infrastructure in those geographic areas where Anderson had exclusive distribution. Only a collusive scheme would allow Defendants to destroy Anderson and co-opt Anderson's business infrastructure because only a prior agreement to work collectively would ensure that the Defendants would not lose business.

Anderson similarly argues that, absent a prior agreement, no single Defendant could be certain that magazine retailers would not frustrate their anticompetitive scheme. Magazine retailers might support Anderson through the boycott by continuing to do business with Anderson despite limitations in their magazine supply. The only way to force retailers to stop doing business with Anderson would be to ensure, through prior agreement, that Anderson would be unable to deliver most of its magazines. Faced with losing most of their magazines, retailers would have no choice but to look to other wholesalers for their magazines. Indeed, this is precisely what happened in 2008, when Curtis unilaterally cut off Anderson's magazine supply: Wal–Mart supported Anderson by accepting the magazine stoppage, forcing Curtis to resume business relations with Anderson. These are legal arguments, not facts. That no one accepted the demand on threat of loss of Anderson's distribution services means only that Anderson made a substantial error in judgment.

The Sixth Circuit has recently rejected similar arguments in the antitrust context. *In re Travel Agent Comm'n Antitrust Li-*

---

**10.** In addition to the allegations in the Complaint, the Court takes judicial notice of the contents of *The New Single Copy* Interview, in which Mr. Anderson describes the Surcharge as an unconditional, non-negotiable ultimatum. Context is key in evaluating the plausibility of Sherman antitrust claims, and *The New Single Copy* Interview, fleshes out the background to the alleged conspiracy. Mr. Anderson undeniably made the statements in *The New Single Copy* Interview; Anderson knew about and possessed the contents of *The New Single Copy* Interview; and the Complaint references *The New Single Copy* Interview and briefly paraphrases its contents (Comp. ¶ 42.). *See Sira v. Morton*, 380 F.3d 57, 67 (2d Cir.2004) (holding that courts will incorporate a written instrument into a complaint when the complaint references it); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir.2002) (holding that where a complaint relies heavily on a document, courts may consider the document's contents). The Court would have reached the same decision even absent knowledge of the contents of the *The New Single Copy* Interview; the Complaint contains enough background information regarding the Surcharge to undermine the plausibility of Anderson's allegations. Indeed, the Complaint itself speaks of Anderson's "decision to impose" the Surcharge, which is entirely consistent with the substance of Mr. Anderson's comments in the *The New Single Copy* Interview (Comp. ¶ 41.)

*tig.*, 583 F.3d 896 (6th Cir.2009). In *Travel Agent*, the plaintiffs, airline ticket brokers, brought an antitrust claim against the airlines under § 1 of the Sherman Antitrust Act, alleging that the defendant airlines conspired over a seven year period to cut their commissions and drive the ticket brokers out of business. *Id.*, at 896. The Sixth Circuit dismissed the antitrust claim, holding that the ticket brokers had failed to allege sufficient facts to plausibly suggest a prior illegal agreement. *Id.*, at 911.

The ticket brokers argued, like Anderson, that the parallel conduct—cutting their commissions—created an inference of collusion because no airline would unilaterally cut the ticket brokers' commissions and risk losing revenue to its competitors. *Id.*, at 908. In support, the ticket brokers pointed to prior attempts by individual airlines to cut their commissions. *Id.* All of these prior unilateral attempts were unsuccessful, demonstrating the necessity of collusion. *Id.*

The Sixth Circuit rejected this argument. *Id.* The Court reasoned that changes in the airline market created an economic incentive to cut commission rates. *Id.* This incentive was greater than the economic incentives that existed in the past, when the airlines previously cut the commissions of ticket brokers unilaterally. *Id.* The Sixth Circuit found it plausible that each of the airlines conducted an independent cost/benefit analysis of the financial impact of payment of current commissions by market participants as opposed to the business lost if its competitors did not also institute cuts. *Id.* Having concluded that their business interests favor cutting commissions, the airlines did so, gambling that its competitors would institute similar cuts. *Id.* If that gamble was wrong, and the leading airline's competitors did not follow suit, then the leading airline could retract its commissions cut. *Id.* The Court

found that this wait-and-see approach was a reasonable alternative explanation for the parallel conduct and thus dismissed the complaint of the ticket brokers as implausible. *Id.*, at 908–09.

The reasoning in *Travel Agent* applies here. Just as the *Travel Agent* Court found it plausible that the airlines independently instituted commission cuts and adopted a wait-and-see approach, so too it is plausible that each of the publisher Defendants unilaterally stopped shipping magazines to Anderson rather than pay the Surcharge. Without that Surcharge, Anderson said it would not offer its distribution services. In these circumstances, Defendants conducted a cost/benefit analysis of the financial impact of payment of Anderson's Surcharge, as opposed to the business lost if their competitor publishers did not also stop shipping magazines to Anderson. Having concluded that their business interests favored rejecting Anderson's ultimatum, the magazine publishers stopped shipping magazines to Anderson, betting that their competitors would follow suit. And if that expectation was ill-founded, then the leading publisher could resume business relations with Anderson, just as Curtis did in 2008.

Indeed, the Sixth Circuit's reasoning applies here with even greater force. In *Travel Agent*, unlike here, the airlines were not faced with a Surcharge ultimatum. When a leading airline instituted commission cuts, no immediate market forces impelled other airlines to make a decision; the status quo could remain undisturbed. That is why the alleged antitrust conspiracy in *Travel Agent* took seven years to implement. Here, by contrast, Anderson changed the status quo by demanding that the industry agree to the Surcharge. If the Defendants did not pay, Anderson would refuse to provide its services. Since they would not pay, they had

no choice but to find alternative sources of distribution (or go without Anderson's services rather than pay the Surcharge). Anderson created a common economic stimulus, impelling an immediate market reaction. The Defendants realized that Anderson's Surcharge ultimatum would precipitate a reaction by their competitors, as did Anderson. Publisher and distributors each decided that, rather than accept the Surcharge, they would not do business with Anderson. Having proposed its pay-it-or else Surcharge, Anderson can not claim collusion in the Defendants' refusal to acquiesce to its self-destructive demand.

Moreover, in *Travel Agent*, the leading airline instituted unilateral commission cuts across the entire airline ticket broker industry. The leading airline thus placed itself at great financial risk; the entire ticket broker industry might retaliate by booking their customers only on airlines that maintained the status quo commission rate. This is, in fact, precisely what occurred on previous occasions, forcing the leading airline to retract its cuts. *Id.*, at 908. Here, by contrast, a publisher unilaterally cutting off its magazine supply from Anderson risked losing revenue only from retailers that Anderson served. Unilateral action by the magazine publishers is thus more plausible than unilateral action by the airlines. Therefore, if the *Travel Agent* Court rejected the ticket brokers' economic motive argument, then, *a fortiori*, the Court rejects Anderson's economic motive argument.

In arguing for the plausibility of its antitrust allegations, Anderson relies heavily on the Second Circuit's recent *Starr* decision. In *Starr*, the Court reversed the dismissal of an antitrust claim against major record labels. 592 F.3d, at 327. *Starr* was in fact the first appellate decision to reinstate an antitrust complaint that had been dismissed under the *Twombly* plausibility standard. Anderson analogizes its

antitrust allegations to the *Starr* antitrust allegations.

Anderson's analogy to *Starr* is unfounded; the allegations in *Starr* are more robust than Anderson's allegations. The *Starr* plaintiffs alleged a conspiracy predicated on defendants' highly unusual parallel conduct: joint ventures to sell music directly to consumers over the Internet for a large fee and with restrictions limiting the right to download and transfer music. *Id.*, at 318–20. The Second Circuit cataloged six different nonconclusory factual allegations, making the alleged parallel conduct plausible. *Id.*, at 323. This array of allegations included parallel pricing at unreasonably high levels; mandating unpopular contract terms for music purchases; failure to respond to dramatic cost reductions with corresponding price reductions; enforcement of a wholesale price floor; and a collective boycott against the number two internet music provider. *Id.* The Second Circuit then proceeded to catalog seven different series of allegations placing the parallel conduct in a context raising a suggestion of a preceding agreement. *Id.*, at 323–24. These allegations included persuasive evidence that the defendants were acting contrary to their business interests; an express inculpatory statement by the CEO of one of the defendants; the defendants' attempt to conceal their enforcement of a wholesale price floor through a secret side letter; investigations of the same alleged price fixing conduct by both the New York State Attorney General and the DOJ; and a simultaneous price increase unexplained by any increase in cost. *Id.*

This host of factors—robust parallel conduct allegations coupled with robust indicia of a preceding price-fixing agreement—persuaded the *Starr* Court that the antitrust allegations were plausible. Anderson's Complaint is distinguishable.

**402**

Accepting all non-conclusory allegations as true, Anderson alleges only that Curtis, TWR, News Group, and Hudson, met at Hudson's New Jersey offices to discuss dividing the U.S. distribution territory into two regions, one controlled by Hudson and the other by News Group (Comp. ¶ 55); that Curtis, Kable, and TWR, Bauer, Hachette, Rodale, and Time cut off 80% of Anderson's magazine supply (Comp. ¶ 47); that Hudson poached several of its employees during the alleged conspiracy (Comp. ¶ 57); that Anderson was forced to lay off thousands of employees and sell its distribution-related assets to News Group at fire-sale prices (Comp. ¶ 67); and that News Group has also succeeded in taking over Anderson's retail distribution business (Comp. ¶ 59.) These conclusory allegations are less plausible than the *Starr* allegations. Unlike the *Starr* plaintiffs, Anderson claims an economically implausible antitrust conspiracy based on sparse parallel conduct allegations. And unlike the *Starr* plaintiffs, Anderson does not place its antitrust conspiracy in a context suggesting a preceding agreement; on the contrary, Anderson alleges facts suggesting that the Defendants merely responded to a common market stimulus created by Anderson itself.

### iii. Analysis of the Plausibility of Anderson's Antitrust Allegations against the Defendants Individually

#### a. Curtis

Anderson seeks to implicate Curtis in the antitrust conspiracy by alleging two inculpatory statements by Bob Castardi, the CEO of Curtis (Comp. ¶¶ 49, 50.) While a court takes all factual allegations as true on a motion to dismiss, legal conclusions and factual inferences are not entitled to the same benefit. *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d at 903.

Castardi's comments are not inculpatory. The Complaint alleges that Castardi told Mr. Anderson, "I don't want a problem. I would like to get this worked out. But I'm going to have to go with whatever Rich [Jacobsen, CEO of TWR] does" (Comp ¶ 49.) Castardi's statement suggests only that he would wait to see what TWR did and that, in fact, he had no actual knowledge of Jacobsen's plans regarding Anderson. Absent prior agreement, waiting to see what a competitor does is legitimate parallel behavior. Similarly, Castardi's statement to Mr. Anderson, "[Y]ou need to let Source go out first" (Comp. ¶ 50) is not, as Anderson argues, an invitation to join a massive antitrust conspiracy.

#### b. TWR

The allegations against TWR center on the meeting at Hudson's offices as well as two statements of Rich Jacobsen, CEO of TWR (Comp. ¶¶ 52–56.) These statements are insufficient to plausibly allege a conspiratorial agreement. First, the Complaint alleges that when Mr. Anderson first told Jacobsen of Castardi's statements indicating that Curtis would follow TWR, Jacobsen "indicated he realized Anderson knew there had been collusion" (Comp. ¶ 52.) Additionally, the Complaint alleges that, at a February 2, 2009 dinner meeting with Anderson and Source, Jacobsen stated "we now control this space" (Comp. ¶ 56), and that on the same date, Jacobsen informed Anderson that TWR and Time executives had decided to "change the channel," that "they were going to have to use two wholesalers," and that "that was the way it was going to be" (Comp. ¶ 54.) The Court cannot infer a conspiracy from bald statements describing the state of the magazine industry and vague "indications" of conspiracy inferred from silence.

### c. Kable

Other than alleging that Kable cut off Anderson's magazine supply (Comp. ¶ 47), the Complaint contains only one specific allegation as to Kable: President and CEO of Kable, Michael Duloc, offered Anderson exclusive distribution of its magazine in certain territories if Anderson dropped the surcharge. (Comp. ¶ 50.) Dulocs's offer does not suggest a preceding agreement; it indicates only a unilateral offer of exclusive distributorship.

### d. AMI

██ The Complaint alleges that Defendant AMI participated in the boycott of Anderson (Comp. ¶ 47.) The Court, however, takes judicial notice of an Order issued in a proceeding in Delaware Chancery Court finding that AMI continued to ship magazines to Anderson in February 2009, after the alleged boycott occurred. *See American Media, Inc.*, Index. No.: 4369-VCL. While a court ordinarily does not take judicial notice of the contents of a Court Order, here, Anderson and AMI were parties to the Delaware proceeding, triggering the doctrine of collateral estoppel. *Jacobs*, 2005 WL 1844642, at *3 (granting motion to dismiss and taking judicial notice of finding from prior proceeding that involved the same parties, which finding contradicted plaintiff's statements in later proceedings). Therefore, the Court rejects Anderson's antitrust allegations as to AMI.

### e. DSI

The Complaint does not allege that DSI engaged in any conspiratorial conduct; it alleges only that DSI is a subsidiary of AMI and a provider of sales and marketing services to publishers (Comp. ¶¶ 16, 28.) These allegations merely describe DSI, not its actions. They are manifestly inadequate to implicate DSI in an antitrust conspiracy.

### f. Time, Bauer, Hachette, Rodale

The Complaint lacks specific allegations as to the publisher Defendants (Time; Bauer; Hachette; and Rodale) other than to allege that they collectively cut off Anderson from its magazine supply (Comp. ¶ 47.) Anderson attempts to implicate the publisher Defendants in the conspiracy through their relationship with the national distributor Defendants (Comp. ¶ 49.) The Complaint's allegation of an agency relationship, however, is conclusory. Moreover, an agency relationship with the national distributor Defendants is insufficient where, as here, the Complaint fails as to the national distributor Defendants.

### g. Hudson

██ The Complaint fails to allege parallel conduct as to Hudson. As the only magazine wholesaler Defendant, Hudson is uniquely situated. The Complaint does not allege that Hudson cut off Anderson's magazine supply; indeed, as a wholesaler, Hudson could not cut off Anderson's magazine supply. The Complaint alleges only that Hudson poached several of Anderson's employees during the alleged conspiracy (Comp. ¶ 57), and that Hudson took over Anderson's retail distribution business (Comp. ¶ 59.) In a letter to the Court dated June 9, 2010, however, Anderson withdrew its allegation that Hudson has taken over Anderson's retail distribution business (Comp. ¶ 59.) There is thus no conceivable role for Hudson in the alleged conspiracy. The single remaining allegation—that Hudson poached several of Anderson's employees—is plainly insufficient to plausibly allege an antitrust claim as to Hudson.

### III. JUDICIAL NOTICE OF THE SOURCE AMENDED COMPLAINT

Non-party magazine wholesaler Source was the plaintiff in a related antitrust con-

spiracy action that has since settled. Source commenced its action on February 9, 2009 and filed an amended complaint ("Source Amended Complaint") on February 10, 2009. Anderson's counsel in this action also represented Source in the Source Action. Anderson's Complaint, however, does not incorporate the allegations in the Source Amended Complaint. On June 15, 2010, at oral argument on this motion, Anderson requested for the first time that the Court take judicial notice of the contents of the Source Amended Complaint.

■ The Court cannot consider the contents of the Source Complaint. Under Fed. R. Evid. 201, courts take judicial notice of facts that are "not subject to reasonable dispute" in that they are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Allegations, however, are often contested—that is the very nature of litigation—and courts will take judicial notice only of the existence of other publicly-filed court documents, not of their contents. *Global Network Communs., Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir.2006). Moreover, Anderson filed its Complaint after Source filed its Amended Complaint. Anderson's counsel thus possessed the contents of the Source Amended Complaint. It is too late for Anderson (if indeed it was ever appropriate) to buttress its pleadings by asking the Court to judicially notice contested allegations in a different proceeding. The Court will not consider the allegations of the Source Complaint, and Anderson's request to do so is denied.

## IV. COMMON LAW CLAIMS

### i. Tortious Interference with Business Relations

■ The Complaint asserts claims for tortious interference with business relations. To state a claim for tortious interference with business relations under New York law, a plaintiff must show that (1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship. *Carvel Corp. v. Noonan*, 350 F.3d 6, 17–18 (2d Cir.2003).[11]

■ In failing to plausibly claim an antitrust violation, the Complaint also fails to adequately plead tortious interference with business relations. Since Anderson is unable to assert a conspiracy, it has not shown that the Defendants used dishonest, unfair, or improper means in interfering with the relationship between Anderson and its retailers. Nor has Anderson argued that the Defendants "acted solely out of malice" in refusing the Surcharge. Conduct undertaken to economically benefit defendants and not solely based on malice toward the plaintiff does not amount to tortious interference with business relations. *MMC Energy, Inc. v. Miller*, 2009 WL 2981914 (S.D.N.Y. Sept. 14, 2009).[12]

---

**11.** The Court applies New York law to Anderson's common law claims because Anderson concedes that there is no conflict between New York law (the law of the forum) and the law of the other jurisdictions whose law Anderson has invoked. *See Alitalia Linee Aeree Italiane, S.p.A. v. Airline Tariff Publ'g Co.*, 580 F.Supp.2d 285, 290 (S.D.N.Y.2008).

**12.** Anderson's pleadings obscure the nature of its tortious interference claim. The Court construes Anderson's claim as one for tortious interference with business relations. Anderson's claim also fails if Anderson is in fact pleading a claim for tortious interference with contract. Anderson alleges that the Defendants forced Anderson to breach its contracts with single-copy magazine retailers. Under New York law, however, to state a claim for tortious interference with contract, a plaintiff must allege the procurement of a third-party breach of contract. *Cont'l Fin.*

### ii. Civil Conspiracy

██ A plaintiff alleging civil conspiracy must assert both an underlying tort and the elements of civil conspiracy. *Kottler v. Deutsche Bank AG,* 607 F.Supp.2d 447, 463 (S.D.N.Y.2009). Having failed to state a claim for any underlying tort, the Complaint fails to adequately plead a civil conspiracy under New York law.

## V. LEAVE TO REPLEAD

The Court dismisses Anderson's Complaint in its entirety. Anderson has failed to plausibly allege an antitrust claim under Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1), and, consequently, it has also failed to adequately plead claims of civil conspiracy and tortious interference with business relations. Anderson has requested leave to amend its Complaint. Anderson has argued that it could amend its pleadings to include allegations, for example, that Rodale monitored the conduct of other members of the industry to determine if they posed a threat to the conspiracy (Plf. Opp. Memo, at 22 n. 14.) The Court denies Anderson's request for leave to amend.

██ District courts have discretion in deciding whether to grant leave to amend a complaint. *Hayden v. County of Nassau,* 180 F.3d 42, 53 (2d Cir.1999). Courts may deny leave to amend where a plaintiff fails to demonstrate it could remedy the complaint's deficiencies. *Id.* at 53.

The defects in Anderson's Complaint are not curable. The context of the alleged antitrust conspiracy—the Surcharge that Anderson tried to impose on the industry to Anderson's advantage and the disadvantage of everyone else—belies the viability of Anderson's antitrust claim. Anderson cannot deny that it decided to impose a Surcharge, and the Court must view any additional allegations of conspiratorial behavior through the lens of the Surcharge. Alleging that Rodale monitored the single-copy magazine industry cannot cure Anderson's antitrust claim, which is based on an economically implausible theory and in which the Defendants merely reacted to a common and dramatic market stimulus.

The incurability of Anderson's antitrust allegations, true as to all the Defendants, is especially true as to AMI, DSI, and Hudson. AMI continued to ship magazines to Anderson and thus did not participate in the boycott of Anderson, the heart of this action. DSI cannot be held liable merely because it is a subsidiary of AMI, which is all Anderson alleges. Amending the Complaint's allegations as to Hudson would likewise be futile because there is no conceivable role for Hudson in the alleged conspiracy: as a wholesaler, Hudson could not cut off Anderson's magazine supply; and Anderson has withdrawn its allegation that Hudson has taken over Anderson's retail distribution business.

In addition to the overall implausibility of Anderson's antitrust claim, the elimination of Hudson from the alleged conspiracy necessitates dismissal of the entire Complaint with prejudice. Anderson has argued that Hudson was critical to the conspiracy (Plf. Opp. Memo, at 22 n. 14.) Yet because Anderson cannot allege that Hudson participated in the conspiracy, Anderson's Complaint is incurable by its own admission.

## VI. CONCLUSION

For the foregoing reasons, the Court GRANTS the Defendants' motions to dismiss (docket entries # 58, # 61, # 63, # 65, # 68) in their entirety and with prejudice. The Clerk of the Court is directed

*Co. v. Ledwith,* 2009 WL 1748875, at *6    (S.D.N.Y. June 22, 2009).

to enter judgment accordingly and close this case.

SO ORDERED.

## ORDER

Plaintiffs Anderson News, L.L.C. and Anderson Services, L.L.C. (together, "Anderson") move for reconsideration of the Court's opinion of August 2, 2010, granting Defendants' Rule 12(b)(6) motion to dismiss Anderson's claims. Specifically, the Court held that Anderson's Complaint failed to meet the plausibility standard of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), and that Anderson could not cure this inadequacy by amending its Complaint,[1]

## LEGAL STANDARD

"Reconsideration of a previous order by the court is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." *Hinds County, Miss. v. Wachovia Bank N.A.*, 700 F.Supp.2d 378, 407 (S.D.N.Y.2010) (citation and quotation marks omitted). "The standard for granting such a motion is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked...." *Shrader v. CSX Transp.*, 70 F.3d 255, 257 (2d Cir.1995). "The major grounds justifying reconsideration are 'an intervening change in controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Hinds County*, 700 F.Supp.2d at 407 (quoting *Virgin Atl. Airways, Ltd.*

*v. National Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir.1992)).

## ANALYSIS

Anderson does not allege any "intervening change in controlling law" or "availability of new evidence," and does not suggest that the Court's ruling will cause "manifest injustice," *See Virgin* 956 F.2d at 1255. As a result, Anderson impliedly asserts that the Court committed "clear error." *Id.*

Anderson argues that the Court erred in concluding that the alleged antitrust conspiracy was not plausible. Although Anderson argues that Defendants had a compelling economic incentive to eliminate Anderson—doing so would allegedly give the Defendants "control" of the single-copy magazine distribution system—a motion for reconsideration "should not be granted where the moving party seeks solely to relitigate an issue that is already decided." *See Shrader*, 70 F.3d at 257. In its Opinion, the Court found that the alleged antitrust conspiracy was not plausible because "publishers and national distributors have an economic self-interest in more wholesalers, not fewer; more wholesalers yields greater competition, which is good for suppliers," (Op.8.) Specifically, the Court held that "it is implausible that magazine publishers would conspire to deny retailers access to their own products," (*Id.*), and noted that, in the Complaint, Anderson itself pointed out that its elimination as a wholesaler has "substantially reduc[ed] the output of magazines ... and the ability of retailers to obtain those magazines." (Compl.¶ 72,) Because "determining

---

1. Plaintiffs' motion was timely filed on August 16, 2010. Defendants Time and Time/Warner responded on September 2, 2010; Defendants AMI, DSI, Bauer, Curtis, Rodale, Hachette Filipacchi, and Kable filed a separate response on the same day. Anderson replied on September 14, 2010. Counsel for Anderson wrote on October 4, 2010 to make corrections in certain factual allegations in its Proposed Amended Complaint with respect to AMI and DSI. Counsel for AMI and DSI responded on October 8, 2010, arguing that the allegations were false.

whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense," *Ashcroft v. Iqbal,* —— U.S. ——, ——, 129 S.Ct. 1937, 1940, 173 L.Ed.2d 868 (2009), the Court's conclusion was neither impermissible, nor "clear error."

Anderson also argues that the Court's determination that the 7–cent surcharge was a "non-negotiable take-it-or-leave-it" demand was "mistaken" and "overlooks the fact, recognized in another part of the Court's Opinion, that neither Anderson nor Defendants treated it as such and that Anderson was entirely flexible and willing to compromise ____" (PL Mem. 4.) This argument is unavailing. Anderson impliedly admits that the Court did not "overlook" this information because, as Anderson points out, the Court recognized in another part of its Opinion that the Defendants had varied reactions to the surcharge. Additionally, the fact that the Defendants had several different reactions to the surcharge—whether the surcharge was negotiable or not—clearly suggests the absence of an antitrust conspiracy. Plaintiffs impliedly ask the Court to assume that either (1) the wholesalers first had several different reactions to the announced surcharge and then abruptly changed course, deciding to engage in unlawful collective action; or (2) the original non-parallel conduct was nothing more than a ruse. The most plausible scenario, however, is that the Defendants each separately came to a similar conclusion—that they did not want to pay a 7–cent surcharge. Thus, the Court permissibly determined that the Defendants' rejection of the surcharge was not plausibly the product of collective action and was simply "a common response to a common stimulus." (Op.11.)

There is no basis for reconsideration. Accordingly, extended discussion regarding Anderson's additional defendant-specific arguments is unnecessary. As to Plaintiffs' request for leave to amend its Complaint, there is no basis for it. The addition of numerous conclusory allegations does not cure the deficiencies of the Complaint the Court dismissed on August 2, 2010,

For the foregoing reasons, Anderson's motion for reconsideration is DENIED.

SO ORDERED.